UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-

JORDAN CHIRICO,

Defendant.

Case No. 1:25-cr-00365 (JLR)

**<u>OPINION AND ORDER</u>**

JENNIFER L. ROCHON, United States District Judge:

Defendant Jordan Chirico ("Chirico") requests that the Court issue a subpoena under

Federal Rule of Criminal Procedure ("Rule") 17(c) compelling a third party, Jefferies Financial

Group, Inc. ("Jefferies"), to produce to Chirico certain documents that he believes will aid in his

defense. For the following reasons, his motion is DENIED.

**BACKGROUND**

### I.    The Indictment

In August 2025, a Grand Jury in this District returned a two-count indictment against

Chirico, charging him with investment adviser fraud and securities fraud. *See generally* Dkt. 4

(the "Indictment"). In short, the Indictment alleges that Chirico managed a hedge fund at

Leucadia Asset Management LLC ("Leucadia"), and that he knowingly invested the fund's

assets in a fraudulent company in which he had an undisclosed financial stake. *Id.* ¶ 1.

More specifically, the Indictment alleges that Chirico personally invested in a company

called Water Station between 2018 and 2021. *Id.* ¶ 4. Water Station made water-purifying

machines ("Water Machines") and sold them to investors, who then formed a joint venture with

Water Station to operate and manage them. *Id.* Chirico invested in the company by purchasing

Water Machines — at the height of his investment, he owned 854 of them, each of which he

purchased for $8,500, for a total investment of over $7 million. *Id.* Water Station agreed to pay

him "a flat 15% yearly return" on his purchase price, *id.* ¶ 5, and Chirico earned tens of

thousands of dollars each month as installments on that return, *id.* ¶ 4.  Chirico had purchased his Water Machines through his LLC, C3 Capital ("C3"), and thus received these monthly payments through C3 from 2019 through 2022.  *Id.* ¶ 5.

In April 2022, Water Station raised capital through a bond offering, *id.* ¶ 10, and the bonds were purportedly collateralized by thousands of revenue-generating Water Machines, *id.* ¶¶ 15, 17.  By that time, Chirico was a portfolio manager at Leucadia, a subsidiary of Jefferies, and he had created a hedge fund called 3|5|2 Capital ABS Master Fund LP (the "352 Fund"), which focused on asset-backed securities.  *Id.* ¶ 7.  Chirico "arranged for the 352 Fund and an affiliate, Jefferies Strategic Investments, LLC" ("JSI") to buy Class B notes that Water Station issued in its April 2022 offering.  *Id.* ¶ 10.  Though he had been hired in May 2020, *id.* ¶ 5, according to the Indictment, Chirico had not disclosed his ongoing investment in Water Station to Leucadia, and although he had disclosed C3's existence in December 2020, he omitted its connection to Water Station, inaccurately stated that its business activity had commenced in 2021 instead of in 2018, and falsely reported that he received no income from the entity notwithstanding his significant ongoing monthly Water Station returns.  *Id.* ¶ 9; *see also id.* ¶ 11.

In August 2022, following 352 Fund's bond purchase, Chirico arranged to sell C3 to Water Station's owner, Ryan Wear ("Wear"), or, alternatively, to one of Wear's other companies.  *Id.* ¶ 12; *see also id.* ¶ 2.  Chirico initially proposed selling each of his Water Machines for $9,500 and additionally receiving $1,081,000 in the transaction, for a total of about $7.2 million.  *Id.* ¶ 12.  However, Chirico would be paid out of funds raised from the bond offering, and the bond offering's terms (the "Indenture") "capped the purchase price of Water Machines at $8,500 per machine."  *Id.*  "To circumvent that restriction," Chirico proposed selling his Water Machines at the capped amount and additionally receiving "an undisclosed seller's note" to make up the difference.  *Id.*  Much of that seller's note was still outstanding in January

2023, at which time Chirico encouraged Water Station to make an additional bond offering; once Water Station did so, Chirico purchased additional Class B Notes for 352 Fund and JSI. *Id.* ¶ 14.

Over the next year, Chirico allegedly learned that most of the bond-collateral Water Machines did not exist. *Id.* ¶¶ 15-16. Indeed, in January 2024, Wear allegedly admitted to Chirico that the bond offering was a fraud, and that Wear had used bond proceeds "to buy traditional vending machines and real estate" instead of Water Machines. *Id.* ¶ 21. Chirico did not disclose this information to Leucadia or the 352 Fund; rather, Chirico invested additional 352 Fund assets in Water Station. *Id.* Moreover, according to the Indictment, Chirico and Wear colluded to use personal loans — including loans from Chirico to Water Station and Wear — to make bond payments to investors, *id.* ¶ 17, and to use proceeds from additional bond offerings to pay out Chirico's undisclosed seller's note, *id.* ¶ 23. In February 2024, the 352 Fund purchased "newly issued Water Station bonds," and, "just a few days" later, "Wear used proceeds from the sale to make a significant repayment on the seller's note to Chirico." *Id.* ¶ 22.

All told, the 352 Fund and JSI bought $19 million in Water Station bonds, and Water Station collapsed in August 2024 without making "any principal payments" on them. *Id.* ¶ 24.

## II.    Procedural History

On April 24, 2026, Chirico moved for the issuance of a subpoena pursuant to Rule 17(c). *See* Dkt. 64 ("Br."); Dkt. 64-6 (the "Proposed Subpoena"). He contends that Jeffries internally investigated Chirico and the Water Station investments before the Indictment was returned. He contends further that Jefferies possesses evidence from that investigation, which it has not turned over to the government and which the government, in turn, knows about (and in some cases has expressly relied upon in building its case against him) but has not requested from Jefferies. *See* Br. at 3-6. This evidence includes an image of Chirico's personal cell phone, *id.* at 4; an image of or extraction from Chirico's work cell phone, *id.*; a "gap analysis" of Chirico's personal cell

3

phone purportedly demonstrating that he deleted certain text messages pertaining to the Water

Station investments after the imposition of a litigation hold, *id.* at 5; unredacted copies of certain

materials that Jefferies produced to the government in redacted form but without an

accompanying privilege log, *id.* at 5-6; and notes that Jefferies's counsel, Scott Balber

("Balber"), took in his meetings with Chirico during Jefferies' internal investigation, as well as

materials from Balber's attorney proffers to the government, *id.* at 6.  Specifically, the Proposed

Subpoena contains the following six requests (the "Requests" and, each, a "Request") for

materials from Jefferies:

1. Any Documents or Communications between or including leadership at Jefferies and/or Leucadia, on the one hand, and 352 Fund personnel on the other, regarding the Indenture, between August 18, 2021, and May 1, 2024, that have not been produced, or have been produced in redacted form, to the Government.

2. Any notes taken by 352 Fund personnel during meetings regarding the Indenture, including those taken on document-sharing platforms, such as Confluence and OneNote, between August 18, 2021, and May 1, 2024, that have not been produced, or have been produced in redacted form, to the Government.

3. Any images, reports, analyses, or data taken from Mr. Chirico's work cell phone.

4. Any images, reports, analyses, or data taken from Mr. Chirico's personal cell phone, including extractions or images taken by Jefferies and its vendor in or around May 2024, and any "gap analysis" or other kind of forensic analysis thereof.

5. Any notes, memoranda or records of calls and meetings between Mr. Chirico and counsel for Jefferies, in or around May 2024.

6. Any notes, presentations, or materials prepared before, during, or after attorney proffers regarding Mr. Chirico or the events described in the Indictment made by Jefferies or its counsel to the Government between May 1, 2024 and August 14, 2025.

Proposed Subpoena at 6-7.

Jefferies filed opposition to the subpoena on May 11, 2026.  *See* Dkt. 68 ("Opp.");
Dkt. 69 ("Balber Decl.").  The government joined Jefferies's opposition in a two-paragraph
letter, relying solely on "the reasons set forth in Jefferies's filings."  Dkt. 70.  Chirico filed a
reply on May 22, 2026.  *See* Dkt. 71 ("Reply").  Accordingly, the motion is fully briefed.

## DISCUSSION

### I.    Legal Standard for Rule 17(c) Subpoenas

Under Rule 17, "[a] subpoena may order the witness to produce any books, papers,
documents, data, or other objects the subpoena designates[, and] [t]he court may direct the
witness to produce the designated items in court before trial or before they are to be offered in
evidence."  Fed. R. Crim. P. 17(c)(1).  However, "the court may quash or modify the subpoena if
compliance would be unreasonable or oppressive."  Fed. R. Crim. P. 17(c)(2).  As a threshold
matter, Chirico and Jefferies disagree over the legal standard that applies to subpoenas issued
under this Rule.

The Supreme Court has held that a Rule 17(c) subpoena is properly issued where the
defendant "clear[s] three hurdles: (1) relevancy; (2) admissibility; (3) specificity."  *United States
v. Nixon*, 418 U.S. 683, 700 (1974).  In particular, the defendant must establish:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise
> procurable reasonably in advance of trial by exercise of due diligence; (3) that the
> party cannot properly prepare for trial without such production and inspection in
> advance of trial and that the failure to obtain such inspection may tend unreasonably
> to delay the trial; and (4) that the application is made in good faith and is not
> intended as a general 'fishing expedition.'

*Id.* at 699-700 (footnote omitted).  To Jefferies, *Nixon*'s application "is not controversial," and
thus *Nixon* controls the Court's inquiry into the third-party subpoena Chirico seeks.  Opp. at 1.
To Chirico, *Nixon* is not on point, because it adopted its standard from *United States v. Iozia*, 13
F.R.D. 335 (S.D.N.Y. 1952) and *Bowman Dairy Co. v. United States*, 341 U.S. 214
(1951) — both of which dealt with Rule 17(c) subpoenas issued to the government — without

expressly deciding whether that standard should be applied to third-party subpoenas in every instance. Br. at 10-11. Rather, Chirico urges, the proper standard for subpoenas issued to third parties should be that set forth in *United States v. Tucker,* under which the Court would look only to whether the discovery sought is "(1) reasonable, construed as 'material to the defense,' and (2) not unduly oppressive for the producing party to respond." *Id.* at 9-10 (quoting *United States v. Tucker*, 249 F.R.D. 58, 66 (S.D.N.Y. 2008)). The Court agrees with Jefferies.

As Jefferies's briefing demonstrates, and as Chirico himself acknowledges, case law in this Circuit is replete with rejections of *Tucker. See* Reply at 5 (acknowledging that Jefferies cited to more than 30 cases that declined to apply *Tucker*); *see also, e.g., United States v. Alexander*, No. 24-cr-00676 (VEC), 2026 WL 366857, at *2 (S.D.N.Y. Feb. 9, 2026) (collecting cases, and noting that the "*Tucker* standard 'has been repudiated by most courts in this district'" (quoting *United States v. Percoco*, No. 16-cr-00776 (VEC), 2018 WL 9539131, at *2 n.2 (S.D.N.Y. June 14, 2018))). Indeed, the Second Circuit — albeit in an unpublished summary order — has addressed *Nixon*'s applicability to third-party Rule 17 subpoenas in a case much like this one. In *United States v. Bergstein*, the defendant was charged with investment advisor fraud for his role in a "fraudulent scheme" involving "impermissible financial transactions," "transfer[s] [of] funds from one pool of . . . investors to benefit another pool of . . . investors without disclosing conflicts of interest," and "convert[ing] a portion of misappropriated . . . funds for his personal benefit." 788 F. App'x 742, 744 (2d Cir. 2019) (summary order). Before trial, the defendant subpoenaed documents from multiple third parties, including two of the government's cooperating witnesses. *Id.* at 746. The district court applied the *Nixon* standard and quashed those subpoenas. *Id.* Noting the defendant's contention that *Tucker*'s "more lenient standard" should apply, the Second Circuit explained that "[w]e have . . . applied the *Nixon* standard to Rule 17(c) subpoenas requested by a defendant, as have district courts in this

6

Circuit[.]" *Id.* (citation omitted); *see also id*. ("[C]ourts in the Second Circuit have almost unanimously applied *Nixon* to subpoenas served on third-parties." (alteration in original) (quoting *United States v. Skelos*, No. 15-cr-00317 (KMW), 2018 WL 2254538, at *1 (S.D.N.Y. May 17, 2018))).  Ultimately, the Second Circuit held that the subpoenas were properly quashed regardless of whether the *Nixon* or *Tucker* standard applied.  *Id.*

Perhaps because *Bergstein* is unpublished, neither Chirico nor Jefferies discusses or cites to it.  Unpublished summary orders are, of course, not precedential and thus not binding on this Court.  2d. Cir. Loc. R. 32.1.1(a) ("Rulings by summary order do not have precedential effect.").  But they "may be seen as highly persuasive and predictive of how the Second Circuit Court of Appeals would decide an issue in the future."  *Liana Carrier Ltd. v. Pure Biofuels Corp.*, No. 14-cv-03406 (VM), 2015 WL 10793422, at *4 (S.D.N.Y. Aug. 14, 2015), *aff'd*, 672 F. App'x 85 (2d Cir. 2016) (summary order).  In fact, as the Second Circuit has explained (in a precedential opinion), "[d]enying summary orders precedential effect does not mean that the [Second Circuit] considers itself free to rule differently in similar cases."  *United States v. Payne*, 591 F.3d 46, 58 (2d Cir. 2010) (first alteration in original) (citation omitted).  *See also M.B. v. Katonah-Lewisboro Union Free Sch. Dist.*, No. 24-cv-01745 (KMK), 2025 WL 2773358, at *17 n.17 (S.D.N.Y. Sept. 25, 2025) ("While summary orders do not have precedential effect, the Court is not at liberty to disregard or contradict 'a Second Circuit ruling squarely on point merely because it was rendered in a summary order' and rather should view such reasoning as '*valuable appellate guidance*.'" (quoting *Bldg. & Realty Inst. of Westchester & Putnam Ctys., Inc. v. New York*, No. 19-cv-11285 (KMK), 2021 WL 4198332, at *19 n.22 (S.D.N.Y. Sept. 14, 2021))).  To be sure, *Bergstein* does not amount to a directive to district courts as to whether they "must apply *Nixon* or whether they might instead apply a different test."  *United States v. Weigand*, 520 F.

Supp. 3d 609, 612 (S.D.N.Y. 2021).  Nevertheless, it is a clear acknowledgement by the Second Circuit of the prevailing approach in this Circuit for Rule 17(c) subpoenas issued to third parties.

Chirico questions the analytical rigor of the numerous cases that support this approach, *see* Reply at 5 ("Many of those cases make no attempt to refute *Tucker*'s reasoning."), but his arguments in favor of applying *Tucker* are not persuasive.  First, Chirico argues that *Nixon* "le[ft] . . . for another day" the question of what standard applies to Rule 17 subpoenas issued to third parties, because the subpoena in that case was appropriately issued to a third party even under "the more stringent standard" applicable to subpoenas issued to the government.[1]  Br. at 10 (citing *Nixon*, 418 U.S. at 699 n.12).  *Nixon* does not create so much uncertainty.  Rather, *Nixon* questioned in a footnote whether "the evidentiary requirement of *Bowman Dairy Co.* and *Iozia* . . . appl[ies] in its full vigor when the subpoena duces tecum is issued to third parties rather than to government prosecutors."  *Nixon*, 418 U.S. at 699 n.12.  But the evidentiary requirement is only one part of the *Nixon* standard.  *See id.* at 699 (requiring, among other things, that documents sought be "evidentiary and relevant"); *id.* at 700 (alternately phrasing evidentiary requirement as "admissibility").  In other words, *Nixon* did not invite lower courts to wholly refashion its framework in the context of a third-party subpoena, but rather suggested that the framework's evidentiary requirement — and that requirement alone — might appropriately be loosened in such a context.  *Tucker* goes considerably further, doing away with both *Nixon*'s evidentiary and specificity requirements entirely and holding that the subpoena must only be "reasonable, construed as material to the defense," and not unduly oppressive.  *Tucker*, 249 F.R.D. at 66 (internal quotation marks and citation omitted).

---

[1] The distinction matters because "Rule 16 obligates the government to disclose certain material to the defendant," and so a subpoena issued to the government under Rule 17(c) risks "exceed[ing] the scope of Rule 16."  *Tucker*, 249 F.R.D. at 65.

8

In arguing that *Tucker* provides the proper standard, Chirico next points to a preliminary draft of proposed amendments to Rule 17 by a committee of the United States Judicial Conference (the "Committee"), which he characterizes as "mak[ing] plain that the more relaxed view of the rule is the correct one."  Br. at 12; *see also* Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, "Preliminary Draft, Proposed Amendments to the Federal Rules of Appellate, Bankruptcy, Civil, and Criminal Procedure, and the Federal Rules of Evidence" (Aug. 15, 2025), https://www.uscourts.gov/sites/default/files/document/preliminary_draft_of_proposed_amendments_final.pdf ("Committee Draft").  Even if a draft proposal advocating for Rule 17(c)'s amendment were persuasive authority on the proper interpretation of Rule 17(c) in its *current* form — which it inherently cannot be — the Committee Draft does not propose adopting the *Tucker* standard, and *Tucker* itself is conspicuously unmentioned in it.  Instead, the proposed amended Rule 17 draws from *Nixon* in the way the Court suggests above, that is, by working within its existing framework: "Rather than substituting an entirely different standard . . . , [it] codif[ies] in Rule 17(c)(2)(B) an interpretation of the *Nixon* standard that is slightly looser than what some courts have demanded," Committee Draft at 75, requiring that the subpoena issuer "describe each designated item with reasonable particularity and seek only items that: are likely to be possessed by the subpoena's recipient; are not reasonably available to the party from another source; and are, or contain information that is, likely to be admissible as evidence in the designated proceeding," *id.* at 81-82.  Indeed, and as Chirico omits, the Committee expressly noted concerns that "any change to the *Nixon* test could increase abuse by defendants," and the "Committee rejected (by a vote of 8 to 4) a more significant departure from *Nixon* that would have required that the items be likely to 'lead to' admissible evidence."  *Id.* at 73.  In other words, Chirico is incorrect that the Committee wrestled with whether a lower standard consistent

9

with *Tucker* should be incorporated into Rule 17 and ultimately agreed with Chirico's preferred approach. Rather, the Committee proposed rule modifications consistent with *Nixon*, with only modest refinements.

Finally, even if the Court viewed *Tucker* as a legally valid approach to Rule 17(c) subpoenas, *Tucker*, by its terms, applied to factual circumstances not present here. While Chirico asserts that "the *Tucker* court did not tether its holding to any specific factual prerequisites," Reply at 5, that is, in fact, precisely what *Tucker* did. There, the court held that "the [*Nixon*] standard is inappropriate where production is requested by (A) a criminal defendant; (B) on the eve of trial; (C) from a non-party; (D) where the defendant has an articulable suspicion that the documents may be material to his defense. A defendant *in such a situation* need only show that the request is (1) reasonable, construed as 'material to the defense,' and (2) not unduly oppressive for the producing party to respond." *Tucker*, 249 F.R.D. at 66 (emphasis added); *see also id.* ("I conclude that the standard annunciated in *Nixon* should not apply in *the instant* situation." (emphasis added)). Even assuming that Chirico has sufficiently established an articulable suspicion that the items he seeks are material, he is not on the eve of trial, and thus he does not meet the requirements that *Tucker* itself set forth.

The Court acknowledges the disconnect between the broad discovery in the civil context and that permitted in the criminal context. *See, e.g.*, *United States v. Rajaratnam*, 753 F. Supp. 2d 317, 321 n.1 (S.D.N.Y. 2011) ("[I]t remains ironic that a defendant in a breach of contract case can call on the power of courts to compel third-parties to produce any documents 'reasonably calculated to lead to the discovery of admissible evidence,' while a defendant on trial for his life or liberty does not even have the right to obtain documents 'material to his defense' from those same third-parties." (citation omitted) (quoting Fed. R. Civ. P. 26(b)(1))); *Weigand*, 520 F. Supp. 3d at 613 (describing *Tucker* as "more consistent with modern principles

of liberal discovery than *Nixon*"). But Rule 17(c) is not a discovery device. *See Nixon*, 418 U.S. at 698-99 (observing that Rule 17(c) is "not intended to provide a means of discovery for criminal cases"); *United States v. Maxwell*, No. 20-cr-00330 (AJN), 2021 WL 1625392, at *2 (S.D.N.Y. Apr. 27, 2021) ("Rule 17(c) subpoenas are not tools of discovery."). The Court also cannot ignore that neither the Second Circuit nor the Supreme Court has adopted *Tucker* in *Nixon*'s place. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 547 F.3d 109, 114 (2d Cir. 2008) ("[D]istrict courts do not, by deciding cases, create law; they apply it."); *see also United States v. Ponce*, No. 15-cr-00156 (KPF), 2015 WL 4254058, at *4 (S.D.N.Y. July 14, 2015) ("The role of this Court is to interpret and apply the law as it exists."). Chirico has not presented any basis for the Court to deviate from the clear consensus in this Circuit that the *Nixon* test should be applied, especially where the Second Circuit continues to reinforce the application of *Nixon* to a Rule 17 subpoena request on a third party. *See Bergstein*, 788 F. App'x at 746.

For all these reasons, the Court will apply *Nixon* in evaluating the subpoena request.

## II.   Application to the Proposed Subpoena

As discussed, *Nixon* has three primary requirements: "(1) relevancy; (2) admissibility; (3) specificity." *Nixon*, 418 U.S. at 700. *Nixon* additionally requires that the documents sought "are not otherwise procurable reasonably in advance of trial by exercise of due diligence[, and] that the [subpoena proponent] cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial." *Id.* at 699; *see also United States v. Jabar*, No. 09-cr-00170, 2016 WL 8671207, at *2 (W.D.N.Y. July 22, 2016) (noting that "[s]ome courts have distilled" all *Nixon* factors into the three primary requirements listed above); *United States v. Barnes*, 560 F. App'x 36, 39-40 (2d Cir. 2014) (summary order) ("[T]he party seeking compliance [with a Rule 17(c) subpoena] must make a preponderance showing that the materials requested are

11

relevant, specifically identified, admissible, and not otherwise procurable by the exercise of due diligence."). The Court finds that some of the Requests founder on relevancy, some on admissibility, and some on specificity; in short, none clears all of *Nixon*'s hurdles. Accordingly, the Proposed Subpoena does not comply with *Nixon*, and the Court will not issue it.

### A.    Specificity

The Court begins with specificity. For this prong, *Nixon* requires "that the application is made in good faith and is not intended as a general 'fishing expedition.'" *Nixon*, 418 U.S. at 699-700. Applying this standard, Courts in this District have held that "[a] Rule 17(c) subpoena does not need to detail the exact contours of materials to which its proponent does not have access." *United States v. Bergstein*, No. 16-cr-00746 (PKC), 2018 WL 9539856, at *1 (S.D.N.Y. Jan 22, 2018). Rather, *Nixon*'s specificity requirement is "intended to provide the subpoenaed party with enough knowledge about what documents are being requested so as to lodge any objections on relevancy or admissibility." *United States v. Donziger*, No. 19-cr-00561 (LAP), 2021 WL 1865376, at *8 (S.D.N.Y. May 10, 2021) (alteration adopted) (quoting *United States v. Avenatti*, No. 19-cr-00373 (PGG), 2020 WL 508682, at *4 (S.D.N.Y. Jan. 31, 2020)); *see also United States v. Carroll*, No. 19-cr-00545 (CM), 2019 WL 6647871, at *1 (S.D.N.Y. Nov. 8, 2019) (explaining that *Nixon* requires a subpoena proponent to "specify the documents with reasonable particularity"). As stated previously, Rule 17(c) is "not intended to provide a means of discovery for criminal cases," *Nixon*, 418 U.S. at 699, and subpoenas issued thereunder are not to be used as "a broad discovery device," *United States v. Ho*, No. 25-cr-00003 (JAV), 2026 WL 184622, at *2 (S.D.N.Y. Jan. 23, 2026) (quoting *United States v. Shestakov*, No. 23-cr-00016 (JHR), 2025 WL 507523, at *1 (S.D.N.Y. Feb. 14, 2025)).

"[C]ourts in this Circuit applying *Nixon*'s specificity requirement routinely distinguish permissible defined requests for definite groups of materials from impermissible blanket requests

for unspecified material," finding only the former sufficiently specific under *Nixon*. *Bergstein*, 2018 WL 9539856, at *1. Here, Jefferies argues that the Proposed Subpoena lacks specificity because each of its requests "ask[s] for 'any' documents relating to broad subject matters." Opp. at 11 (citation modified). The Court agrees in part and disagrees in part.

Requests 3 and 4 of the Proposed Subpoena are sufficiently specific. These Requests seek "[a]ny images" that have already been taken of Chirico's personal and work cell phones, as well as a "gap analysis" or other forensic analysis conducted on the image taken of Chirico's personal cell phone. *See* Proposed Subpoena at 6-7. According to the government's notes from a telephone conference with Balber, Balber himself informed the government that Jefferies has indeed taken an image of at least one of these phones and performed a gap analysis of that image. *See* Dkt. 64-2 at 8. Moreover, in a sworn declaration to this Court, Balber confirmed that "[his] firm had hired an outside vendor to perform a 'detailed gap analysis' [of Chirico's phone] that showed Chirico's deletion of documents." Balber Decl. ¶ 24; *see also id.* ¶¶ 7-8. Jefferies cannot now be heard to claim — in motion papers signed by Balber — that requests for any such images lack specificity. *See* Opp. at 11 (mischaracterizing Proposed Subpoena as seeking "'any' documents relating to . . . Chirico's 'phones'" rather than images already taken of those phones (citation modified)); *id.* at 14 (arguing that Chirico "does not seek any specifically identified documents" and thus "cannot show that any of these unidentified documents would be admissible").

The same principle applies to Requests 5 and 6, which seek notes and other records reflecting (1) calls and meetings between Chirico and Balber in May 2024 and (2) attorney proffers Balber made to the government regarding the Indictment between May 2024 and August 14, 2025. *See* Proposed Subpoena at 7. These requests are specific enough to allow Jefferies, which participated in such meetings and conversations through Balber, to identify the materials

13

sought and object to their "relevancy or admissibility."  *Donziger*, 2021 WL 1865376, at *8 (citation omitted); *see also* Balber Decl. ¶¶ 6, 9 (identifying two such meetings between Balber and Chirico in May 2024); *id.* ¶¶ 12, 22-25 (recounting Balber's telephone calls and meetings with government regarding Water Station and Chirico between July 2024 and August 2025); Opp. at 11 (mischaracterizing Proposed Subpoena as seeking "'any' documents relating to . . . Jefferies'[s] and the [g]overnment's investigation into Chirico's fraudulent activities" (citation modified)); *see also id.* at 15-17 (objecting to admissibility of Balber's notes).

Requests 1 and 2 do not pass muster, however.  These seek "[a]ny" documents or communications concerning the Indenture "between or including leadership at Jefferies and/or Leucadia, on the one hand, and 352 Fund personnel on the other . . . between August 18, 2021, and May 1, 2024, that have not been produced, or have been produced in redacted form, to the [g]overnment," as well as "[a]ny notes taken by 352 Fund personnel" about the Indenture in the same time period.  Proposed Subpoena at 6.  Unlike Requests 3-6, these Requests — insofar as they seek any such documents not already produced to the government — pertain to an unspecified universe, and Chirico himself concedes that he does not know what that universe might contain.  *See* Br. at 6 (noting that "Jefferies has made at least fourteen voluntary productions to the U.S. Attorney's Office between July 2024 and March 2026" as well as a production to the SEC, but that, because Chirico has not seen the government's document requests or any privilege log from Jefferies's SEC production, "it is left to defense counsel to back out what evidence might be missing" and to "speculate as to the contents of [redacted or withheld documents]").  That is a hallmark of non-specificity.  *See Bergstein*, 788 F. App'x at 746 (affirming quash of subpoena that sought "all e-mails or other communications [that cooperating witnesses] authored or received relating to almost thirty paragraphs from [defendant]'s indictment," as "overly broad" and "plainly constitut[ing] a fishing expedition for

14

documents the government did not obtain and that [defendant] admittedly cannot identify" (alterations adopted) (internal quotation marks and citations omitted)); *Skelos*, 2018 WL 2254538, at *3-4 (quashing subpoena request for "all documents" that certain entities produced to government "as part of [its] investigation" where defendants "do not know the scope of that investigation" and thus "do not know the universe of documents they are requesting"); *United States v. Cole*, No. 19-cr-00869 (ER), 2021 WL 912425, at *4 (S.D.N.Y. Mar. 10, 2021) (quashing subpoena that sought "[a]ll personnel records for [cooperating witness], including but not limited to human resources files, employment applications, employment contracts, records of disciplinary actions and separation agreements," rather than "specific parts" of the file (citations omitted)); *Bergstein*, 2018 WL 9539856, at *2 (quashing subpoena requests seeking "communications *other than* in connection with three agreements" as "relating to a potentially vast number of unspecified payments or transactions" and thus "prototypical of 'fishing expeditions'"); *cf. United States v. Johnson*, No. 10-cr-00431 (CM), 2013 WL 3948454, at *1 (S.D.N.Y. July 24, 2013) ("A general assertion that certain material 'might contain exculpatory information' is insufficient to prevail against a motion to quash under Rule 17(c)." (quoting *United States v. Scaduto*, No. 94-cr-00311 (WK), 1995 WL 130511, at *2 (S.D.N.Y. July 24, 2013))).

In sum, even though Requests 1 and 2 contain language limiting their scope to a specific subject-matter, particular individuals, and a set timeline, *see* Reply at 7, the Requests nevertheless "read[] like a request under the Federal Rules of Civil Procedure. But this is not a civil case, and the rules of civil discovery do not apply." *United States v. Avenatti*, No. 19-cr-00373 (PGG), 2020 WL 86768, at *6 (S.D.N.Y. Jan. 6, 2020) (finding Rule 17(c) subpoena overbroad where it sought "all audio recordings (and transcripts thereof)" involving particular individuals discussing particular topics over particular timeframe); *see also Maxwell*, 2021 WL

15

1625392, at *2 (finding Rule 17(c) subpoena overbroad and "akin to discovery requests in civil litigation" because it sought "communications between 'any' owner, shareholder, partner or employee of [an entity] and government officials" over particular timeframe).

Therefore, Requests 1 and 2 fail to meet *Nixon*'s specificity requirement to the extent they seek documents not already produced to the government that fall within the described parameters, and the Court denies Chirico's motion to issue the Proposed Subpoena with respect to that aspect of Requests 1 and 2.

### B.    Relevancy

The Court next addresses relevancy.  Under Federal Rule of Evidence ("FRE") 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence," and if "the fact is of consequence in determining the action."  Fed. R. Evid. 401.  The Second Circuit has held that this test "is a 'low threshold, easily satisfied.'" *United States v. Garnes*, 102 F.4th 628, 638 (2d Cir. 2024) (quoting *United States v. Gramins*, 939 F.3d 429, 450 (2d Cir. 2019)); *see, e.g.*, *United States v. Ray*, 585 F. Supp. 3d 445, 459 (S.D.N.Y. 2022) (finding that evidence of victims' mental-health vulnerabilities was relevant to government's allegation that defendant exploited those vulnerabilities).  Accordingly, "evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt" to be considered relevant within the meaning of FRE 401.  *Gramins*, 939 F.3d at 450 (quoting *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010)).  Chirico clears this low bar for Requests 4 through 6 and for the remainder of Requests 1 and 2, but not for Request 3.

Requests 4 and 5 seek data already taken from Chirico's personal cell phone, forensic analysis of that data, and notes and other records of Chirico's meetings with Jefferies's in-house counsel during Jefferies's internal investigation into the Water Station investments.  *See* Proposed Subpoena at 7.  Chirico argues that these notes and records from the internal

investigation contain his own relevant statements regarding (1) his investments in Water Station and his disclosures to Jefferies about them, (2) his sale of C3, and (3) Jefferies's internal investigation.  Br. at 14.  He further argues that data from his phone contains information regarding the deletion of messages from that phone, which is relevant at least to the government's allegation that he destroyed evidence leading up to the Indictment.  *Id.* at 15. Request 6 seeks relevant notes and other materials related to Jefferies's attorney proffers made to the government in connection with this matter.  *See* Proposed Subpoena at 7.  The sufficiently specific aspect of Requests 1 and 2 of the Proposed Subpoena seek privileged or otherwise redacted communications between Jefferies leadership and 352 Fund personnel concerning the Indentures, as well as notes taken by 352 Fund personnel at meetings regarding the Indentures. *See id.* at 6.  Chirico argues these documents are relevant to the government's allegation that he concealed Water Station's purported fraud from Jefferies, because they "go[] to the heart . . . of whether Jefferies was, in fact, informed of Water Station's issues" and nevertheless participated in the bond offerings in an effort to "turn the business around."  Br. at 13.

The Court agrees with these relevancy arguments.  The communications, data, and documents Chirico seeks all have some tendency to make facts at issue in this case more or less likely, such as whether — contrary to the allegations in the Indictment — Jefferies was in fact aware of Chirico's personal investments and the alleged underlying fraud at Water Station, or whether Chirico destroyed pertinent documents.  *See, e.g.*, *United States v. Wey*, 252 F. Supp. 3d 237, 254 (S.D.N.Y. 2017) (finding that "evidence potentially suggesting that [the corporate victim] had actual knowledge" of defendant's market manipulation "could be 'of consequence' to a determination as to whether [he] engaged in deceptive conduct"); *S.E.C. v. Galleon Mgmt., LP*, 274 F.R.D. 120, 123 (S.D.N.Y. 2011) ("totally agree[ing]" with arguments that subpoena in insider trader case requesting "communications about the companies and stocks at issue" sought

information relevant to "the reasons for the trades defendants allegedly conducted, and to defendants' knowledge of information concerning the companies"); *United States v. Walker*, 982 F. Supp. 288, 293 (S.D.N.Y. 1997) (finding subpoenaed "file jackets recording . . . payment" were "relevant to defendant's pecuniary motive and financial gain" in case where defendant was charged with "engag[ing] in a fraudulent scheme whereby he submitted false asylum applications and defrauded applicants out of the fees they paid"). In opposition, Jefferies does not make relevancy arguments under FRE 401, but rather asserts that Chirico "[n]ecessarily" fails to demonstrate relevance because he has not "specifically identif[ied] the documents sought." Opp. at 14; *see also id.* at 11-13 (arguing that Proposed Subpoena is insufficiently specific). This assertion is of little force given that the Court has rejected Jefferies's specificity argument as to these Requests.

The Court parts ways with Chirico on Request 3, however. That Request seeks any image or data already taken from Chirico's work cell phone. *See* Proposed Subpoena at 5. In arguing for the relevance of such data, Chirico merely asserts that the device contains "clearly relevant material," and that "relevant communications on [his] work device [] are unquestionably relevant to [his] defense in this case." Br. at 13-14. While it is certainly plausible that there is relevant material on Chirico's work cell phone, Chirico's circular and vague assertions of relevance fail to connect the data from Chirico's work cell phone to any fact at issue in this case. They are therefore insufficient to clear even the low bar of FRE 401. *See United States v. Barnes*, No. 04-cr-00186 (SCR), 2008 WL 9359654, at *3 (S.D.N.Y. Apr. 2, 2008) (finding subpoena "insufficient to satisfy the *Nixon* requirements" where proponent "d[id] not articulate how the subpoenaed materials would be relevant[, and] [r]elevance cannot be established merely by asserting that the documents are relevant"). Moreover, even though Request 3 meets *Nixon*'s specificity requirement because Jefferies has enough knowledge to identify the particular item

18

requested (the imaged work phone), Chirico's failure to identify relevant evidence within that item suggests that Request 3 is a fishing expedition, which Rule 17(c) is not intended to be. *See Nixon*, 418 U.S. at 699-700.

Therefore, Requests 1 and 2 (to the extent they seek materials withheld from the government), and Requests 4, 5, and 6 meet *Nixon*'s relevancy requirement, but Request 3 does not. Accordingly, the Court denies Chirico's motion to issue the Proposed Subpoena with respect to Request 3.

### C.     Admissibility

Finally, the Court turns to admissibility. Generally, "[u]nless an exception applies, all 'relevant evidence is admissible.'" *Gramins*, 939 F.3d at 450 (quoting *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012)). Still, proponents of Rule 17(c) subpoenas must "carry [the] burden" of establishing the grounds for admissibility of the materials they seek. *Nixon*, 418 U.S. at 700. And under *Nixon*, "the items sought cannot merely be potentially . . . admissible. Rather, they must be shown to be . . . admissible at the time the subpoena is sought." *Wey*, 252 F. Supp. 3d at 253 (quoting *Barnes*, 2008 WL 9359654, at *3); *accord Shestakov*, 2025 WL 507523, at *4. Chirico has not provided sufficient bases for admissibility for the materials he seeks.

To the extent that Requests 1 and 2 seek the more ascertainable universe of materials that Jefferies has withheld in whole or in part from the government on privilege grounds, *see* Reply at 7, those aspects of the Requests do not comport with *Nixon*'s admissibility requirement. *See, e.g.*, *Donziger*, 2021 WL 1865376, at *9 ("Documents containing privileged material generally are inadmissible."). Chirico has cited no authority to support his suggestion that the government must demand a privilege log from Jefferies or otherwise require Jefferies to justify its privilege designations, Br. at 23, or that the government must provide him with any such log or justifications, *id.* at 7. Chirico argues that Jefferies has waived any privilege over these withheld

documents, *id.* at 22-23, but he fails to identify any particular document subject to such a waiver; instead, he asserts vaguely that Jefferies "has produced certain documents reflecting conversations between [him] and 352 Fund personnel and leadership at Jefferies and/or Leucadia about these topics" but has "redacted substantial portions of those conversations." *Id.* at 22. Producing documents with redactions does not support waiver, however. Waiver occurs when "the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication *over which the privilege is claimed*." *United States v. Anthem*, No. 20-cv-02593 (ALC) (KHP), 2025 WL 2426482, at *4 (S.D.N.Y. Aug. 22, 2025) (emphasis added) (quoting *Fullerton v. Prudential Ins. Co.*, 194 F.R.D. 100, 102 (S.D.N.Y. 2000)). Nothing before the Court indicates that such a disclosure has occurred here.[2]

As to Requests 4 and 5, Chirico argues that "notes from [his] interviews with Jefferies counsel in May 2024, and contemporaneous communications on his . . . personal devices []

---

[2] The Court also notes Balber's sworn representation that the entirety of Jefferies's production to the government in this criminal matter is identical to the productions Jefferies has already made to Chirico in civil litigation between Jefferies and Chirico. Balber Decl. ¶ 25 ("DOJ requested that Jefferies produce to it those documents that Jefferies had produced in response to Chirico's document requests in the civil litigation. Jefferies agreed and, since that time, Jefferies has provided DOJ with copies of all of the productions that it has made to Chirico in the civil litigation."); *see also id.* ¶¶ 13-21 (describing discovery activity in civil matter in the Southern District of New York, which has been dismissed, and in ongoing civil matter in New York State Supreme Court, New York County). Chirico does not contest this representation on reply. Instead, he argues that the Proposed Subpoena seeks documents that Jefferies has withheld from him during that civil litigation. *See* Reply at 9 (explaining that Jefferies "has withheld and redacted documents responsive to Request Nos. 1 and 2" from its civil productions). But Chirico fails to explain why he did not challenge Jefferies's privilege designations in the civil litigation, *see* Balber Decl. ¶ 21 (representing that Jefferies "has provided certified privilege logs" to Chirico in that litigation), or why this Court should now permit him to use Rule 17(c) in place of such a challenge. That failure is an independent basis for the Court to deny Chirico's motion with respect to these parts of Requests 1 and 2. *See Nixon*, 418 U.S. at 699 (holding that proponent must demonstrate that documents sought "are not otherwise procurable reasonably in advance of trial by exercise of due diligence"); *United States v. Joseph*, No. 23-cr-00068 (JPO), 2023 WL 8006613, at *2 (S.D.N.Y. Nov. 17, 2023) (finding Rule 17(c) subpoena "fails on [*Nixon*'s] final prong" where defendant could obtain "his personnel file through the exercise of due diligence").

would be admissible as prior consistent statements" if he "were . . . to testify at trial . . . , since the government undoubtedly would seek to impeach his credibility." Br. at 17. Such an argument implicitly recognizes that Chirico's own statements are hearsay and, therefore, inadmissible unless an exception or exclusion applies. *See United States v. Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) ("A defendant may not introduce his own prior out-of-court statements because they are 'hearsay, and not . . . admissible.'" (omission in original) (quoting *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982)); *United States v. Cummings*, 858 F.3d 763, 772 (2d Cir. 2017) ("Hearsay is admissible only if it falls within an enumerated exception." (quoting *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013)). To be sure, prior consistent statements may be admissible as an exclusion to hearsay. *See* Fed. R. Evid. 801(d)(1)(B) (excluding from hearsay the prior statements of a declarant witness "subject to cross-examination about [the] prior statement[s]" where the statements are "consistent with the declarant's testimony" and "offered[] to rebut an express or implied charge" of fabrication). But the Court cannot measure the consistency of this information against testimony that has not been given. That is fatal under *Nixon*, because "Rule 17(c) requires a showing that the materials sought are currently admissible in evidence," and "the fact that the requested information '*may* be admissible is not sufficient.'" *United States v. Peraire-Bueno*, No. 24-cr-00293 (JGLC), 2025 WL 2062021, at *16 (S.D.N.Y. July 23, 2025) (first quoting *United States v. Rich*, No. 83-cr-00579 (SWK), 1984 WL 845, at *3 (S.D.N.Y. Sept. 7, 1984); and then quoting *United States v. RW Pro. Leasing Servs. Corp.*, 228 F.R.D. 158, 162 (E.D.N.Y. 2005)).

Chirico similarly contends that materials he seeks through Requests 4, 5, and 6 "represent 'proof tending to establish bias or motive to fabricate, which is almost always relevant and never collateral,'" and that he is "entitled to impeach" any Jefferies employee that may testify in this matter on the basis of that purported bias. Br. at 17 (quoting *United States v. Seabrook*, No. 16-

21

cr-00467 (ALC), 2017 WL 4868311, at *3 (S.D.N.Y. Oct. 23, 2017)).  Subpoenas do not clear *Nixon*'s hurdles when they, as this one does, seek evidence to be used for the impeachment of potential witnesses at trial.  *See Nixon*, 418 U.S. at 701 ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."); *Seabrook*, 2017 WL 4838311, at *2 ("Impeachment evidence is insufficient to require its production *in advance of trial*.  This is because impeachment material is not relevant for production until a witness has testified." (citation omitted)); *accord United States v. Shea*, No. 20-cr-00412 (AT), 2022 WL 13847351, at *2 (S.D.N.Y. Oct. 24, 2022).  Rather, "subpoenas for impeachment material are only returnable 'if and when the witness who has made the statement takes the stand and testifies.  The defendant only then is entitled to inspect these statements.'"  *Percoco*, 2018 WL 9539131, at *1 (alterations adopted) (quoting *United States v. James*, No. 02-cv-00778 (SJ) (CLP), 2007 WL 914242, at *29 (E.D.N.Y. Mar. 21, 2007)).  Here, Chirico has not identified any witness whose testimony he would impeach with materials obtained through Requests 4-6; he merely speculates that "a number of [Jefferies] employees" will "likely" testify for the government at trial.  Br. at 18.  That is not enough.  Indeed, while Chirico cites *United States v. Carollo* as supporting his Requests for evidence that may suggest bias, *see id.* at 17-18, he omits that the subpoena in that case was issued to "an unindicted coconspirator who [wa]s scheduled to testify."  *United States v. Carollo*, No. 10-cr-00654 (HB), 2012 WL 1195194, at *1 (S.D.N.Y. Apr. 9, 2012).  Thus, to the extent the Requests seek impeachment materials, those materials are not yet relevant, and therefore the Requests fail on both relevancy and admissibility.  *See United States v. Dennis*, 132 F.4th 214, 239 (2d Cir. 2025) ("Irrelevant evidence is not admissible." (quoting Fed. R. Evid. 402)).

Some courts have modified the return date of Rule 17(c) subpoenas that seek impeachment materials in similar circumstances, instead requiring production only once such

testimony has been given or scheduled.  *See, e.g.*, *Seabrook*, 2017 WL 4838311, at *2-3 (modifying subpoenas requesting impeachment materials to be returnable on date of pertinent witnesses' testimony); *cf. Skelos*, 2018 WL 2254538, at *6 (noting availability of similar modification but, to avoid potential trial delay, instead requiring sooner production "to the Court, for *in camera* review," and providing that "the [c]ourt will release any relevant and admissible documents to [d]efendants and the [g]overnment after [the witness's] testimony").  But Chirico does not identify the witnesses who will testify and whom he will seek to impeach, and therefore such a modification is not workable here.

Although Jefferies raises these and other admissibility issues with the Requests in its opposition brief, on reply Chirico simply and unconvincingly dismisses those arguments as "unavailing."  Reply at 9.  Chirico also contends that *Nixon*'s admissibility prong "really goes to the question of relevance to the proponent's defense."  Br. at 16.  However, relevancy is a necessary but not sufficient condition for admissibility, as *Nixon* recognized by setting down both requirements, and Chirico fails to establish that the materials he seeks are admissible.  Therefore, Requests 4, 5, and 6, and the remainder of Requests 1 and 2, do not clear *Nixon*'s admissibility hurdle, and the Court denies Chirico's motion to issue the Proposed Subpoena with respect to Requests 4, 5, and 6, and the remainder of Requests 1 and 2.

## CONCLUSION

For all the foregoing reasons, the Court DENIES Chirico's motion to issue the Proposed Subpoena.  The Clerk of Court is respectfully directed to terminate the motion at Dkt. 64.

Dated: June 18, 2026
       New York, New York

                                                   SO ORDERED.

                                                   _____
                                                   JENNIFER L. ROCHON
                                                   United States District Judge

23